# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| CITY OF DOVER, a municipal corporation of the State of Delaware, | : : : : | C.A. No. K21C-06-042 JJC |
| Plaintiff, | : : | |
| v. | : : : | |
| CASSIDY COMMONS, LLC, | : : | |
| Defendant. | : : | |

Submitted: February 6, 2024
Decided:    February 27, 2024

## POST-TRIAL DECISION

Nicholas H. Rodriguez, Esquire, SCHMITTINGER & RODRIGUEZ, P.A., Dover, Delaware, *Attorney for Plaintiff.*

Michael K. DeSantis, Esquire, Anthony N. Delcollo, Esquire, and Thomas H. Kramer, Esquire, OFFIT KURMAN P.A., Wilmington, Delaware, *Attorneys for Defendant.*

**Clark, R. J.**

Plaintiff City of Dover (hereinafter "Dover" or "the City") sues Defendant Cassidy Commons, LLC ("Cassidy") for unpaid bills for electric service delivered to two commercial units. Although Cassidy owns the units, it contends it need not pay Dover because Cassidy's commercial tenant assumed responsibility to pay the bills in their lease (hereinafter the "lease").[1] For that reason, Cassidy submits that Dover's sole recourse is against the tenant, and not Cassidy.[2]

As explained below, the City's electric tariff drives the result in this case because it identified Dover and Cassidy as the two parties to the contract and makes Cassidy responsible to pay the bill. After considering the tariff, the evidence and arguments presented at trial, and the parties' post-trial submissions, the Court finds in favor of the City. Cassidy owes Dover $44,191.11.

## I. PROCEDURAL AND FACTUAL BACKGROUND

The City provided electricity to Suites E and F at 401 Cassidy Drive, in Dover (hereinafter "the units").[3] Cassidy owns the units but denies liability for the bills. When it denied liability, it filed a third-party complaint against its tenant, Underminers, LLC ("Underminers") for indemnification.[4] Underminers did not file a response, and Cassidy obtained a default judgment against Underminers as to liability.[5]

Thereafter, Dover and Cassidy stipulated to a bench trial which the Court held on January 17, 2024. From the start of the case through the end of trial, the

---

[1] Pre-Trial Stipulation and Order (D.I. 54).
[2] *Id.*
[3] Compl. (D.I. 1); *see also* Def.'s Ex. 1, Commercial Lease Summary Page (identifying units E and F as the subjects of the instant dispute).
[4] Third-Party Compl. (D.I. 23).
[5] *See* D.I. 44 (granting an entry of default judgment against third-party defendant Underminers, LLC).

parties focused their arguments on common law contract principles. At the conclusion of trial, the Court observed that Dover's claim for unpaid electric charges implicate aspects of public utility law. As a result, it asked the parties whether Dover's electric tariff answers the question of who must pay – (1) the landlord that owned the units, applied for the service, and kept its name on the account, or (2) the tenant who occupied the unit and used the electricity.

## II. POSITIONS OF THE PARTIES

Dover seeks $44,191.11 from Cassidy for service provided to the units from January 2018 through December 2019.[6] The common law aspect of the City's claim focuses on the fact that Cassidy applied for the service,[7] the units received the service, and Cassidy's name remained on the account until Cassidy asked Dover to terminate service in December 2019.[8] Dover contends that these facts demonstrate Cassidy's liability in contract regardless of whether Cassidy separately delegated its responsibility to pay to another.[9]

Initially, Dover focused only on common law contract principles to support its claim against Cassidy.[10] Presently, the City also relies upon the electric tariff and City Code provisions that it contends identify Cassidy as the responsible party.[11]

---

[6] D.I. 1.

[7] Pl.'s Ex. 1; *see also* D.I. 64 (arguing that Cassidy is liable for the unpaid balance because Mark North, an authorized agent for Cassidy, signed the application for service and thereby formed a binding contract with Dover).

[8] Pl.'s Ex. 2. at 2.

[9] D.I. 54.

[10] *Id.*

[11] *See* D.I. 67 (arguing that the tariff and the City Code provides that property owners who have submitted and signed and application for service are responsible for the payment of that service and that the City's electric tariff sets the rate).

Cassidy denies liability but does not dispute the amount of the unpaid bill due Dover. As did Dover, Cassidy initially relied upon common law contract principles in defense. It contends that only Underminers could be held liable because Underminers assumed the duty to pay pursuant to the lease.[12] Although Cassidy offered no evidence that either it or Underminers presented a copy of the lease to Dover, it submits that Dover should have known that Cassidy delegated the duty to Underminers because other Cassidy Commons tenants provided their identically-termed leases to Dover.[13] Finally, Cassidy relies on the reasoning in a Connecticut trial court decision: *Connecticut Light & Power Co. v. Hartmann's Enterprises, Inc.*[14] That decision, it contends, demonstrates that Underminers, and not Cassidy, had the duty to pay.[15]

After trial, the Court asked the parties to address the impact of Dover's electric tariff on their case. It did so because tariffs establish the terms of the relevant contract between a utility and a ratepayer, and a city council approved tariff carries the force of law.[16]

In Dover's post-trial submission, it identified the customer classification included in the tariff that it contends applied to the units.[17] Dover emphasizes that the tariff incorporates certain City ordinances, that in turn, incorporate the City of Dover Municipal Electric Department's Service Handbook (the "Handbook") into

---

[12] *See* Def.'s Ex. 1 § 4 ¶ A [hereinafter *Lease Agreement*] (stating that the tenant is responsible for initiating electric service and paying the resulting charges).

[13] D.I. 68 at 7.

[14] 2007 WL 2429226 (Ct. Super. Aug. 10, 2007).

[15] D.I. 68.

[16] *See* 64 Am. Jur. 2d *Public Utilities* § 52 (2023) ("Under the filed-rate doctrine, a tariff filed with and approved by an administrative agency [or a municipality] under a statutory scheme is more than a mere contract; such a tariff acquires the force and effect of law.").

[17] *See* D.I. 67 at 3 (asserting that Cassidy Commons falls into the "C5" classification for Large Commercial customers).

the tariff.[18]  In combination, Dover contends that the tariff, the City Code, and the City rules and regulations make Cassidy the responsible party.

Cassidy disagrees and counters that Dover's electric tariff and Code provisions demonstrate the opposite – that is, Underminers is Dover's customer, not Cassidy.[19]  Finally, Cassidy objects to Dover's recent attempt to specify the customer classification for the units because Dover offered no evidence at trial to support it.[20]

### III.  STANDARD

In a bench trial, the Court sits as the trier of fact.[21]  In civil actions, the burden of proof is by a preponderance of the evidence.[22]  To carry this burden, the party who holds the burden of proof on an issue must prove that the contested matter is more likely true than not.[23]

In a judge's role as a trier of fact, he or she must judge the witnesses' credibility and determine the weight to assign their testimony.[24]  When doing so, the Court is "free to accept or reject any or all of the sworn testimony, as long as

---

[18] *Id*. at 2–3.

[19] *See* D.I. 68 at 2–3 (arguing that because Cassidy was not the one paying the bills or occupying the premises, Cassidy does not qualify as Dover's customer per the definition supplied in the Handbook); *see also* CITY OF DOVER, ELECTRIC SERVICE HANDBOOK 11 (2023) ("[A] customer is any adult person … or other entity: (i) in whose name a service account is listed, (ii) who occupies or is the ratepayer for a premises …, and (iii) who is primarily responsible for payment of bills.")

[20] *See* D.I. 68 at 2 n.3 (explaining that Cassidy will not concede that the classification identified by Dover is the correct one because it was not specifically introduced into evidence at trial and is not part of the record).

[21] *Pecander Associated, LLC v. Synergy Direct Mortg. Inc.*, 2010 WL 2681862, at *2 (Del. Super. June 30, 2010).

[22] *Id.* (citing *Gregory v. Frazer*, 2010 WL 4262030, at *1 (Del. Com. Pl. Oct. 8, 2010)).

[23] *Carey v. Estate of Myers*, 2015 WL 4087056, at *17 (Del. Super. July 1, 2015), *aff'd*, 132 A.3d 749 (Del. 2016).

[24] *Mundy v. Devon*, 906 A.2d 750, 755 (Del. 2006); *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005).

it consider[s] all of the evidence presented," in the same way as would a jury.[25] If the Court cannot harmonize conflicting testimony, it must determine which portions deserve more weight.[26]

## IV.    FACTUAL FINDINGS

The Court finds the following facts by a preponderance of the evidence presented at trial.  Cassidy owns Cassidy Commons in Dover and rents commercial units in the complex to various tenants.   It rented Suites E and F at 401 Cassidy Drive to Underminers in 2017.[27]   Testimony at trial demonstrated that the units were newly outfitted and did not have electric service before Cassidy leased them to Underminers.   In the rental agreement, a lease term obligated Underminers to pay for electric service for the units.[28]   The lease also obligated Underminers to indemnify Cassidy if Underminers failed to pay for that service.[29]

Cassidy produced no witness to testify that anyone had provided an agent of Dover with a copy of the lease or that any Dover employee knew the lease's terms. For their part,  Dover's witnesses testified that they never received a copy of the lease or discussed its terms with Cassidy or Underminers.

---

[25] *Pardo v. State*, 160 A.2d 1136, 1150 (Del. 2017).

[26] *Foraker v. Rife*, 2017 WL 1424330, at *2 (Del. Com. Pl. Apr. 3, 2017) (citing *Nat'l Grange Mut. Ins. Co. v. Nelson F. Davis, Jr.,* 2000 WL 33275030, at *4 (Del. Com. Pl. Feb. 9, 2000)).

[27] *See Lease Agreement* (naming Cassidy Commons, LLC as the landlord for 401 Cassidy Drive, Suites E and F).

[28] *Id.* § 4 ¶ A. Section 4 provides that the "[l]andlord represents that the property is capable of electric, gas, and water services… Tenant shall [ ] be responsible for all charges associated with such utility services."

[29] *Id.* § 11 ¶ A. Section 11 provides that the tenant covenants to "indemnify, defend, and hold harmless" the landlord in any liability or expenses attributable to the tenant's "(1) [ ] possession, use, occupation, management, repair, maintenance, or control of the building, (2) act, omission, negligence, willful misconduct …, (3) any default, breach, violation, or nonperformance of this Lease or any provision therein by Tenant…"

6

The two newly built-out units at issue had no electric service before Underminers leased the units from Cassidy.[30]  Despite Underminers promise in the lease to handle electric service, Cassidy, and not Underminers, initiated electric service by applying for it.[31]   Later, Underminers abandoned the units at the end of the disputed billing term, but not before two years' of unpaid bills accrued.[32]  After Cassidy learned that Underminers had abandoned the units and Dover sent Cassidy to collections, Cassidy contacted the City by letter to formally cancel service for the units as of December 30, 2019.[33]   At trial, Cassidy did not contest that $44,191.11 remains due on the account -- it contests only its obligation to pay it.

## V.    ANALYSIS

For the following reasons, the City met its burden as to liability.  Dover demonstrated that Cassidy, as the applicant for service and the electric account holder, owes the City $44,191.11.   Dover's obligation to pay arises from (1) the tariff, the City Code, and publicly available documents incorporated into the tariff, and (2) common law contract principles.

### A.  The tariff requires Cassidy to pay the outstanding electric charges even though it delegated that duty to Underminers.

The City's claim for unpaid electric fees is controlled by Delaware statute, Dover tariff, Dover's City Code, and a Dover Electric Department publication incorporated into the tariff by reference.   As an overview of utility law, utility

---

[30] *See* Def.'s Ex. 4 (showing billing estimates for installation of conductors, transformers, metering, and other devices necessary to initiate electrical service for the units).

[31] Pl.'s Ex. 1 (application for electric service); *see also id.* (letter from Michael Cassidy to City of Dover) ("I hereby authorize Mark North to sign on behalf of Cassidy Commons LLC.")

[32] Third-Party Compl. (D.I. 23) ¶¶ 6–7.

[33] Pl.'s Ex. 2 (cancellation of service request sent by Cassidy's managing member) ("Please disconnect the three accounts [for Units E and F] effective today.").

7

services are often monopolistic in character. Regulatory law governing these essential services strives to balance the interests of ratepayers with the interests of the utilities that provide them. As part of the compact between a regulated utility and its ratepayers, a utility has no option other than to provide electric service to qualifying customers within its service territory.[34] Namely, the utility, in this case the City of Dover Electric Department, cannot arbitrarily or discriminatorily deny service to someone in City limits.[35] Whether it be by the Delaware Public Service Commission ("PSC") in some contexts or municipalities in others, a governmental entity approves the rates and terms that control the delivery (and in some cases supply) of electric service within a service territory. Once approved, the rates and other terms bind both the customer and the utility. On balance, the tariff-controlled contract terms carry the force of law when defining the terms of the contract between a utility and its ratepayers.[36]

The PSC has exclusive regulatory authority over public utilities in the State, subject to a few exceptions.[37] One relevant exception – which applies in this case – is the statutory limitation of PSC jurisdiction over municipally-owned electric companies that serve customers within their corporate limits.[38]

---

[34] *Mayor and Council of City of Dover v. Delmarva Enters., Inc.*, 31 A.2d 276, 277 (Del. 1973); *see also* 64 Am. Jur. 2d *Public Utilities* § 52 (2023) ("The purpose of the tariff is to ensure uniformity of utility rates and prevent a utility from discriminating based on price or service.").
[35] *Delmarva Enters., Inc.*, 31 A.2d, at 277.
[36] *See* 64 Am. Jur. 2d *Public Utilities* § 52 (2023) ("Under the filed-rate doctrine, a tariff filed with and approved by an administrative agency under a statutory scheme is more than a mere contract; such a tariff acquires the force and effect of law."); *see also id* §51("A tariff amounts to a binding contract between the utility and its customer and supersedes all other agreements between the parties.").
[37] 26 *Del. C.* § 202.
[38] *Id.* (a); *see also Adams v. Delmarva Power & Light Co*, 575 A.2d 1103, 1102 (Del. 1990) (recognizing that a municipality has the authority to decide who provides utility service to customers within its corporate limits).

In public utility law, the provider of services must obtain an approved tariff from a governmental authority – whether it be the PSC in some contexts, or a municipality such as Dover, in others. A tariff is the document that prescribes the terms and rates for the utility's services.[39] The tariff also controls the utility's relationship with its customers.[40] In other words, a tariff defines the parameters of the contract between the customers and the utility.[41] In billing disputes such as the present, courts look to general rules of contact interpretation when applying the terms contained in a tariff.[42]

Here, Dover's Charter authorized Dover's City Council to adopt ordinances to regulate electric services for public and private customers.[43] Dover's electric tariff, adopted by the City in the same manner as an ordinance, establishes service classifications and the rates charged for customers under those classifications.[44] Furthermore, Dover's tariff incorporates other City Code provisions and the rules and regulations that define the relationship between the Electric Department and its customers.

After the close of the evidence, Dover identified a customer classification that it contends applied to Cassidy: "Large Commercial Service Classification."[45] The document outlining that classification in the tariff also incorporates certain Dover rules and regulations.[46] Cassidy counters that the Court should reject

---

[39] 64 Am. Jur. 2d *Public Utilities* § 51 (2023).
[40] *Id.*; *see also Development Recovery Company, LLC v. Pub. Serv. Co. of Colo.*, 410 P.3d 1264 (Colo. App. 2017).
[41] 64 Am. Jur. 2d *Public Utilities* § 51 (2023).
[42] *Id.*
[43] Dover C. (Charter) § 25.
[44] CITY OF DOVER, RATES & TARIFFS (July 1, 2018).
[45] D.I. 67, Ex. 1.
[46] D.I. 67.

Dover's proffered customer classification because Dover presented no evidence of it at trial.

Although Cassidy is correct, for two reasons, the proper customer classification in this case is immaterial. First, *all* customer classifications identified in the tariff contain the following identical relevant provision: "the General Rules and Regulations of the City of Dover for electric service shall apply to service rendered under [each] service classification."[47]   In that way, Dover incorporated the same rules and regulations into the provisions creating *every* customer classifications served by the City. Second, Cassidy does not dispute the amount due Dover.   In this debt action for an unpaid electric bill, Cassidy's concession as to the amount due makes the proper customer rate irrelevant.   For these reasons, Dover's failure at trial to identify which customer classification applied has no impact on the Court's decision.

Turning to the relevant tariff and Code provisions, the nature of Dover's contractual relationship with Cassidy is first framed by the following reference in the City Code:

> the City of Dover Municipal Electric Department's Service Handbook [the "Handbook"] is hereby incorporated by reference into the laws of the City. A copy of the aforesaid handbook shall be filed in the city clerk's office and available to the public for inspection.[48]

In that way, Dover incorporates the Handbook into the tariff. The focus then turns to two relevant provisions in that Handbook:   the provision that defines who

---

[47] *See, e.g.*, CITY OF DOVER, RATES & TARIFFS 4 - 7 (July 1, 2018) ( incorporating identically,  for *all* customer classifications, including Residential Service Classification "R", Small Commercial Service Classification "C and C1," Medium Commercial Service Classification "C2 and C3," and Large Commercial Service Classification "C5,"  "[t]he General Rules and Regulations of the City of Dover for electric service shall apply to service rendered under this service classification.").

[48] Dover C. § 110-31.

qualifies as an electric customer, and the provision that defines an electric service contract.

First, the Handbook defines "customer" as follows:

[a]ny [entity]: (i) in whose name a service account is listed, (ii) who occupies or is the ratepayer for a premises, building, structure, etc., *and* (iii) who is primarily responsible for payment of bills.[49]

This conjunctively constructed definition requires an entity to meet three requirements to qualify as a customer.

Regarding this definition of customer, Cassidy contends that only Underminers could qualify because only Underminers occupied the units and used the electricity. Cassidy's contention fails to recognize, however, that one must be an approved service account holder to qualify as a customer. While Cassidy and Underminers could arguably both meet the second and third required requirements to qualify as a "customer," only Cassidy satisfied the first requirement because it was the sole account holder throughout the delivery of service. Namely, Cassidy remained the named account holder from the time it initiated service until Cassidy requested its disconnection. Moreover, Cassidy's repeatedly unsuccessful reminders to Underminers to assume responsibility as the account holder demonstrate Cassidy's understanding of the importance of being the named account holder.

Second, the Handbook explains the steps needed to create an electric service contract and identifies the parties to that contract. Specifically, it provides:

[a]n application form must be completed and approved to engage in a contract for service. A service contract is required to receive electric service from the City. The Handbook and any Rules and Regulations adopted by the City shall be part of every contract for electric service

---

[49] CITY OF DOVER, ELECTRIC SERVICE HANDBOOK 11.

11

and shall govern all classes of service unless otherwise stated by the service classification in the Rates and Tariffs Handbook. [50]

Focusing on this definition drives the outcome even more directly that focusing on who meets the definition of customer. Namely, the description of an "electric service contract" explains what actions an entity must take to initiate such a contract. It also identifies the parties to that contract. First, one must complete an application form. Second, the City must approve the application. Third, after there is an approved application, a "service contract" comes into being between the applicant and the City. Fourth and finally, electric service is provided *only* to the entity holding the service contract. The only reasonable reading of these provisions in sequence recognizes that Cassidy is responsible to pay for the service.

On balance, Cassidy applied for the service, remained the account holder during the entirety of the disputed billing period, and asked Dover to disconnect the service after Underminers abandoned the units.[51] Under the tariff-controlled regulatory scheme creating the parameters and terms of a contract for electric service, Cassidy must pay for the service.

### B. The application of common law contract principles provides the same result; Cassidy breached its contract with the City by refusing to pay.

Apart from applying the terms of an electric service contract created by tariff, simply applying common law contract principles would drive the same result. Namely, Cassidy owned the units and applied for electric service for the units. Dover then provided uninterrupted service to the units. When payment on

---

[50] *Id.* at 27.

[51] *See also* CITY OF DOVER, ELECTRIC SERVICE HANDBOOK 17 (providing that only "customers" may request to have service disconnected). There is no reasonable reading of the tariff, the City Code, or the Handbook incorporated by reference into the Code that provides for a result other than that recognizes Cassidy as the primarily responsible party).

the account ceased, Dover began collection efforts against Cassidy. Finally, Dover and Cassidy demonstrated their mutual understanding that Cassidy was the customer because Dover continued to provide the service until Cassidy cancelled it.

Cassidy contends that (1) Underminers' contractual assumption of the duty to pay in the lease, and (2) Underminers' payment of the bills on behalf of Cassidy until January 2018 relieved Cassidy of its obligation to pay. This misconstrues black letter contract law. As recognized by the Restatement (Second) of Contracts, *"[u]nless the obligee agrees otherwise*, neither delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor."[52] In other words, while Cassidy was free to delegate its responsibilities by lease, Cassidy retained its obligation to pay Dover absent a novation.[53] Here, there is no evidence that Dover consented to Cassidy substituting Underminers as the responsible party.[54] In fact, Dover insisted that Cassidy retain its obligation to Dover throughout the arrangement. In this case, the evidence permits no strained inference, much less a reasonable one, that Dover agreed to relieve Cassidy of its obligation by assent or separate agreement.

Finally, Cassidy's reliance on the Connecticut trial court decision in *Connecticut Light & Power Co.* is similarly misplaced. Namely, that decision

---

[52] RESTATEMENT (SECOND) OF CONTRACTS §318(1) (AM. L. INST. 1981).

[53] *P.F. Connection, Inc. v. Synygy Ltd.*, 2021 WL 57016, at *13–14 (Del. Ch. Jan. 7, 2021).

[54] *See Reserves Dev. LLC v. Crystal Properties, LLC*, 986 A.2d 362, 370 n.23 (Del. 2009) ("An obligor is discharged by the substitution of a new obligor only if the contract so provides or if the oblige makes a binding manifestation of assent, forming a novation. Otherwise, *the obligee retains his original right against the obligor, even though the obligor manifests an intention to substitute another obligor manifests an intention to substitute another obligor and the other purports to assume the duty*." (emphasis added) (citing RESTATEMENT (SECOND) OF CONTRACTS §318(1)).

addressed only one count that went to trial, in what was a five-count action involving multiple parties.[55] There, the Connecticut court addressed a utility's claim against a tenant's individual guarantor for non-payment of electric charges.[56] The court relied on a term in the lease together with the guarantee to garner the contracting parties' intent that the utility became a third-party beneficiary of the tenant's promise to pay for electric.[57] While the court found the tenant's guarantor liable to the utility on a third-party beneficiary theory,[58] it did *not* find the primarily responsible party to be relieved of its obligation. Rather, the court implied, in part, that, by the time of trial, the utility was pursing the only remaining avenue for recovery due to insolvencies.[59]

Here, whether Dover could directly recover from Underminers is immaterial. The Court doubts that Dover would qualify as an intended third-party beneficiary of the Cassidy/Underminers lease because Dover officials and employees had no knowledge of its terms, and the lease did not imply that Dover was a third-party beneficiary. Regardless, the Court need examine the issue no further because even if Dover had standing to sue Underminers directly, Dover never agreed to surrender its right to recover from Cassidy.

In summary, Dover prevails regardless of whether its debt action turns on the tariff or common law contract principles. Cassidy must pay for the service that it initiated, retained in its name, and terminated.

---

[55] *Conn. Light & Power Co. v. Hartmann's Enters., Inc.*, 2007 WL 2429226 (Conn. Super. Aug. 10, 2007).
[56] *Id.* at *3.
[57] *See id.* (explaining that the personal guaranty executed by the defendant obligated the defendant to ensure the full performance of the tenant's obligation to pay for utilities and imposed a direct obligation to pay the [utility provider] for utility service).
[58] *Id.*
[59] *Id.*

## C. The damages due Dover are uncontroverted.

Dover submitted a schedule, supported by competent testimony, itemizing unpaid electric charges in the amount of $44,191.11.[60] Cassidy had no objection to the exhibit or testimony. As a result, Dover carried its burden of proof regarding the damages caused by Cassidy's breach.

## VI. CONCLUSION

The tariff, Dover ordinances, and the Handbook identify Cassidy as the customer and party obligated to pay on this account. Likewise, Cassidy would be obligated to pay for the service under common law contract principles absent the tariff. Accordingly, judgement is entered on behalf of Plaintiff City of Dover and against Defendant Cassidy Commons, LLC for $44,191.11.

As a final note, Cassidy obtained a default judgment against Underminers with the caveat that a future inquisition at the bar would fix the damages due Cassidy.[61] While it would have been most economical to address the damages owed Cassidy during the trial, the docket fails to reflect that Underminers received notice of the time and day for trial. The damages due Cassidy in indemnity may well be a *fait accompli* under the circumstances. Nevertheless, Underminers is entitled to notice of a hearing that impacts its rights, even upon inquisition.[62] As a result, entry of judgment as to damages on Cassidy's third-party indemnification

---

[60] Pl.'s Ex. 3.

[61] D.I. 44. The default judgment order left damages to be fixed by "[a]n inquisition hearing on the amount of damages due . . . in conjunction with the trial of this matter." *Id.*

[62] *See* Super. Ct. Civ. R. 55 ("If, in order to enable to Court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages . . . the Court may conduct such hearings or order such references as it deems necessary and proper and shall accord a right of trial by jury to the parties when and as required by any statute.").

15

claim must be deferred pending a properly noticed inquisition at the bar. If Cassidy desires such a hearing, it must contact the Prothonotary within thirty days to secure a convenient date and time to present the matter.

**IT IS SO ORDERED.**

/s/ Jeffrey J Clark
Resident Judge

16